## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of Nominal Defendant BIG LOTS, INC., | NO. 2:12-cv-0447 |
| | VERIFIED DERIVATIVE COMPLAINT |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| JEFFREY PAUL BERGER, ROBERT CRAIG CLAXON, JOE R. COOPER, STEVEN S. FISHMAN, CHARLES W. HAUBIEL II, TIMOTHY A. JOHNSON, DAVID T. KOLLAT, BRENDA J. LAUDERBACK, PHILLIP E. MALLOT, JOHN CHARLES MARTIN, NORMAN J. RANKIN, PAUL ALAN SCHROEDER, ROBERT SAMUEL SEGAL, STEVEN RAY SMART, RUSSELL SOLT, and DENNIS B. TISHKOFF, | |
| Defendants, | |
| and | |
| BIG LOTS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff"), by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint) against the defendants named herein, and alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Big Lots, Inc. ("Big Lots" or the "Company") against certain of the Company's officers and members of its Board of Directors (the "Board"), referred to herein collectively as the "Individual Defendants" (as defined below), seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment in connection with an insider selling scheme perpetrated by the Individual Defendants.

2.     On March 2, 2012, Big Lots issued a press release highlighting "record results" for the fourth quarter of 2011 and fiscal year 2011 and touting positive guidance for its fiscal first quarter of 2012 and fiscal year 2012.  Certain of the Company's officers, including the Company's Chairman of the Board and Chief Executive Officer Steven S. Fishman ("Fishman"), held a conference call on that same day reinforcing to Big Lots' shareholders the positive guidance outlined by the Company in its press release.

3.     Days later, between March 6, 2012 and March 28, 2012, several of the Company's senior officers and directors sold hundreds of thousands of shares of Big Lots common stock in a manner inconsistent with their normal trading patterns.  Then, on April 23, 2012, less than a month after the Individual Defendants' selling spree, Big Lots updated its first quarter guidance for the fiscal quarter ending April 28, 2012, disclosing that the Company now expected comparable store sales to be "slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%."  On this news, Big Lots' stock price plummeted by approximately 24% on extremely high trading volume.

4.     The Individual Defendants' abundant stock sales between March 6, 2012 and March 28, 2012, just after issuing glowing financial results and guidance and just prior to

releasing information reversing the Company's previous rosy financial projections, were based on their knowledge of material, non-public information concerning the Company's true financial condition prospects, and thus were in breach of their fiduciary duties as officers and directors of Big Lots. The Individual Defendants' actions were also in violation of the Ohio Uniform Trade Secrets Act, ORC §§ 1333.61 *et seq*, which prohibits the misappropriation of business or financial information. Accordingly, Plaintiff brings this action seeking to disgorge the Individual Defendants of their ill-gotten stock sale proceeds.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), because Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and justice.

7.      Venue is proper in this Court under 28 U.S.C. § 1391(a) because: (i) Big Lots is incorporated and maintains its executive offices in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

8.      Plaintiff LAMPERS is a citizen of the State of Louisiana.  LAMPERS is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.  Neither LAMPERS nor any of its trustees are citizens of a state in which any defendant is a citizen.

9.      Nominal defendant Big Lots is an Ohio corporation with its principal executive offices located at 300 Phillipi Road, Columbus, Ohio 43228.  According to its website, Big Lots offers brand-name closeouts and bargains that create a unique shopping experience for millions of customers.  Big Lots offers a broad assortment of merchandise, including consumables, seasonal products, furniture, housewares, toys and gifts and is the nation's largest broadline closeout retailer

10.     Defendant Jeffrey Paul Berger ("Berger") has served as a director of the Company since 2006.  Berger is the former Executive Vice President, Global Foodservice, and President and Chief Executive Officer of Heinz North America Foodservice.  Upon information and belief, Berger is a citizen of the State of Florida.

11.     Defendant Robert Craig Claxton ("Claxton") has served as Big Lots' Senior Vice President of Marketing since January 2005.  Prior to joining the Company in 2005, Claxton served as General Manager and Executive Vice President of Initiative Media, an advertising and communications company, and Chief Marketing Officer and Senior Vice President of Montgomery Ward, a retailer.   Upon information and belief, Claxton is a citizen of the State of Ohio.

12.     Defendant Joe R. Cooper ("Cooper") has served as Executive Vice President of Big Lots since March 2010, and has responsibility for loss prevention and risk management.  Cooper joined Big Lots' as Vice President of Strategic Planning and Investor Relations in May

-4-

2000.  In July 2000, Cooper assumed responsibility for the treasury department and was appointed Vice President, Treasurer.  Cooper was promoted to Senior Vice President and Chief Financial Officer in February 2004 before assuming his current position.  Upon information and belief, Cooper is a citizen of the State of Ohio.

13.     Defendant Fishman is Chairman, Chief Executive Officer and President of Big Lots.  Fishman joined Big Lots in July 2005.  Upon information and belief, Fishman is a citizen of the State of Ohio.

14.     Defendant Charles W. Haubiel II ("Haubiel") serves as the Company's Executive Vice President of Legal and Real Estate, General Counsel and Corporate Secretary.  Haubiel became Executive Vice President in March 2010 and assumed responsibility for real estate in January 2008.  Haubiel joined Big Lots in 1997 as Senior Staff Counsel and was promoted to Director, Corporate Counsel and Assistant Secretary in 1999, and to Vice President, General Counsel and Corporate Secretary in 2000.  Haubiel was promoted to Senior Vice President, General Counsel and Corporate Secretary in November 2004.  Upon information and belief, Haubiel is a citizen of the State of Ohio.

15.     Defendant Timothy A. Johnson ("Johnson") has served as Vice President, Strategic Planning and Investor Relations of the Company since February 2004.  Johnson joined Big Lots in 2000 as Director of Strategic Planning.   Upon information and belief, Johnson is a citizen of the State of Ohio.

16.      Defendant David T. Kollat ("Kollat") has served as a director of the Company since 2005.  Kollat has been President and Chairman of 22, Inc., a company specializing in research and management consulting for retailers and consumer goods manufacturers, since 1987.  Upon information and belief, Kollat is a citizen of the State of Florida.

17.     Defendant Brenda J. Lauderback ("Lauderback") has served as a director of the Company since 1997.  Lauderback is also currently a director of Denny's Corporation, Select Comfort Corporation, and Wolverine World Wide, Inc.  Upon information and belief, Lauderback is a citizen of the State of Texas.

18.     Defendant Phillip E. Mallot ("Mallot") has served as a director of the Company since 2003.  Mallott is an independent financial consultant and retail stock analyst. Mallott previously served as the Vice President and Chief Financial Officer of Intimate Brands, Inc. and as a director of Tween Brands, Inc.  Upon information and belief, Mallot is a citizen of the State of Ohio.

19.     Defendant John Charles Martin ("Martin") serves as the Company's Executive Vice President of Administration.  Prior to that, Martin served as Executive Vice President of Marketing since December 2003.  Upon information and belief, Martin is a citizen of the State of Texas.

20.     Defendant Norman J. Rankin ("Rankin") has served as the Company's Senior Vice President, Big Lots Capital and Wholesale since January 2008.  Rankin joined Big Lots in 1998 as Vice President, Consumables and also served as Senior Vice President, General Merchandise Manager.  Upon information and belief, Rankin is a citizen of the State of Ohio.

21.     Defendant Paul Alan Schroeder ("Schroeder") has served as Vice President and Controller of Big Lots since September 2005.  Schroeder joined the Company in April 2005 as Director, Accounting Operations.  Upon information and belief, Schroeder is a citizen of the State of Ohio.

22.     Defendant Robert Samuel Segal ("Segal") serves as the Company's Senior Vice President and General Merchandise Manager.  Segal joined Big Lots in 2004 as Vice President,

Divisional Merchandise Manager, Furniture, and became Senior Vice President, General Merchandise Manager for the furniture and home categories in January 2008.  Upon information and belief, Segal is a citizen of the State of Ohio.

23.     Defendant Steven Ray Smart ("Smart") serves as the Company's Senior Vice President and General Merchandise Manager for the consumables and hardlines categories, as well as Big Lots' play & wear department.  Smart joined Big Lots in 2003 as Vice President, Divisional Merchandise Manager.  Upon information and belief, Smart is a citizen of the State of Ohio.

24.     Defendant Russell Solt ("Solt") has served as a director of the Company since 2003.   Solt is the former Director of Investor Relations of West Marine, Inc. where he also previously served as the Executive Vice President and Chief Financial Officer. Additionally, Solt previously served as the Chief Financial Officer of Venture Stores, Inc. and Williams-Sonoma, Inc.  Upon information and belief, Solt is a citizen of the State of Oregon.

25.     Defendant Dennis B. Tishkoff ("Tishkoff") has served as a director of the Company since 1991.  Tishkoff is also the Chairman and Chief Executive Officer of Drew Shoe Corporation and the President of Tishkoff and Associates, Inc.  Tishkoff previously served as the President and Chief Executive Officer of Shoe Corporation of America.  Upon information and belief, Tishkoff is a citizen of the State of Ohio.

26.     Collectively, defendants Berger, Claxton, Cooper, Fishman, Haubiel, Johnson, Kollat, Lauderback, Mallot, Martin, Rankin, Schroeder, Segal, Smart, Solt, and Tishkoff are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the

Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

28.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Big Lots, each of the Individual Defendants had knowledge of non-public information regarding the Company.

30.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

     a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

     b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and

requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

    d.    refrain from acting upon material inside corporate information and unduly benefiting themselves and other Company insiders.

31.    Moreover, Section 3 of the Company's Code of Conduct and Business Ethics ("Code of Ethics") explicitly forbids insider trading,[1] stating, in relevant part:

Associates, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company should be considered confidential information. To use non-public information for personal financial benefit or to "tip" other who might make an investment decision on the basis of this information is not only unethical but also illegal.

32.    As alleged in more detail below, between March 6, 2012 and March 28, 2012, the Individual Defendants breached their fiduciary duties of loyalty and good faith by using material non-public information to sell more than 817,000 shares of Big Lots' common stock at prices higher than they could have obtained had the market been aware of the material non-public information, thereby reaping in excess of $37 million in illegal insider trading proceeds for their personal gain.

---

[1] Section 1 of the Code of Ethics, titled Compliance with Law, Rules, and Regulations, also states:

Obeying the law, both in letter and spirit, is the foundation on which this Company's ethical standards are built. . . . . The Company holds information and training sessions to promote compliance with laws, rules and regulations, including insider-trading laws.

## SUBSTANTIVE ALLEGATIONS

### The Company Announces Record Results for 2011 and Positive Guidance for 2012

33.     On March 2, 2012, Big Lots issued a press release entitled "Big Lots Reports Record Results."   The press release reported positive earnings for the fourth quarter of fiscal 2011, as net income totaled $114.7 million, or $1.75 per diluted share, compared to $110.1 million, or $1.46 per diluted share, for the fourth quarter of fiscal 2010.  Big Lots also reported earnings for fiscal 2011, ended January 28, 2012, with net income totaling $207.1 million, or $2.98 per diluted share. For fiscal 2011, Big Lots reported income from continuing operations totaling $207.2 million, or $2.99 per diluted share, compared to $222.5 million, or $2.83 per diluted share, for fiscal 2010.

34.     Additionally, the March 2, 2012 press release touted positive guidance for fiscal 2012 and the first quarter of fiscal 2012.  Specifically, the press release stated: "We estimate adjusted income from U.S. operations in a range of $0.85 to $0.90 per diluted share (non-GAAP), a 21% to 29% increase over last year's $0.70 per diluted share.  This is based on a comparable store sales increase in the range of 2% to 4% and a total U.S. sales increase in the range of 6% to 8%."  The press release also stated, in pertinent part:

#### 2012 GUIDANCE

- **Initial fiscal 2012 adjusted income from continuing operations projected to be $3.40 to $3.50 per diluted share (non-GAAP); a 14% to 17% increase over fiscal 2011**
- **Comparable store sales expected to increase 2% to 3% for U.S. stores**
- **Anticipate 90 new store openings in the U.S.**
- **Initial cash flow guidance estimated to be approximately $200 million**

We estimate fiscal 2012 adjusted income from continuing operations will be in the range of $3.40 to $3.50 per diluted share (see non-GAAP reconciliation below) compared to income from continuing operations of $2.99 per diluted share for fiscal 2011. We are operating under a 53-week retail calendar for fiscal 2012 and the positive corresponding impact of the extra week of operations adds approximately $0.10 per diluted share to our estimates for fiscal 2012. The

average diluted share count is estimated to be approximately 65 million for fiscal 2012, with no assumption for share repurchase activity. We estimate this financial performance will result in cash flow of approximately $200 million. Our estimates for fiscal 2012 exclude the non-recurring, non-cash after-tax inventory charge of $3.4 million described above.

*U.S. Operations*

We estimate adjusted income from continuing operations to be in the range of $3.63 to $3.73 per diluted share (non-GAAP), a 14% to 17% increase over fiscal 2011 results of $3.18 per diluted share (non-GAAP). This is based on a comparable store sales increase in the range of 2% to 3% and a total U.S. sales increase in the range of 8% to 9% in fiscal 2012. From a real estate perspective, we expect to open 90 new stores in the U.S. during fiscal 2012 and close up to 45 locations for net store growth of 45 stores, or approximately 3%.

*Canadian Operations*

Canadian sales are expected to be in the range of $140 to $150 million for fiscal 2012, resulting in an operating loss in the range of $14 to $17 million, or $0.21 to $0.26 per diluted share (non-GAAP).

**Fiscal Q1 2012 Guidance**

For the first quarter of fiscal 2012, we estimate our adjusted consolidated income from continuing operations will be in the range of $0.75 to $0.81 per diluted share (non-GAAP), a 7% to 16% increase compared to income of $0.70 per diluted share for the first quarter of fiscal 2011. As a reminder, this estimate excludes the non-recurring, non-cash after-tax inventory charge of $3.4 million described earlier in this release.

We estimate adjusted income from U.S. operations in a range of $0.85 to $0.90 per diluted share (non-GAAP), a 21% to 29% increase over last year's $0.70 per diluted share. This is based on a comparable store sales increase in the range of 2% to 4% and a total U.S. sales increase in the range of 6% to 8%.

Canadian sales are expected to be in the range of $25 to $30 million for the first quarter of fiscal 2012, resulting in an operating loss in the range of $6 to $8 million, or $0.09 to $0.12 per diluted share (non-GAAP).

| *Consolidated Company Guidance* | Fiscal 2012 | |
|---|---|---|
| | Full Year | Q1 |
| Guidance as Adjusted (non-GAAP) | $3.40 - $3.50 | $0.75 -$0.81 |
| Adjustment for non-recurring Inventory charge | ($0.05) | ($0.05) |
| Guidance on GAAP basis | $3.35 - $3.45 | $0.70 - $0.76 |

35.     On March 2, 2012, the Company also hosted a conference call with shareholders where certain of Big Lots' officers provided commentary which reinforced the Company's positive fiscal guidance for 2012.  In particular, Cooper, Big Lots' Chief Financial Officer and Executive Vice President, stated:

> For our US operations, we estimate adjusted income from continuing operations to be in the range of $3.63 to $3.73 per diluted share, a 14% to 17% increase over fiscal 2011 results of $3.18 per diluted share. This is based on a total sales increase of 8% to 9%, and a comparable store sales increase in the range of 2% to 3%.

**The Company's Officers and Directors Sell Massive Amounts of Stock Between March 2, 2012 and March 28, 2012**

36.     Just four days after the March 2, 2012 press release, many of the Company's officers and directors began selling large amounts of their Big Lots common stock based on their knowledge that the Company's first quarter 2012 guidance was overstated.  As described in further detail herein, the stock sales were not consistent with the Individual Defendants' historical trading patterns.

37.     Specifically, on March 6, 2012, Kollat sold 60,000 shares of Big Lots common stock for a weighted average sale price of $43.62 per share.  Kollat effected these sales by exercising six different grants of 10,000 stock options each, some of which did not expire until 2017.  Kollat reaped nearly $3 million in illegal insider trading proceeds for his own personal

gain from selling his Big Lots' stock on March 6, 2012.  Prior to this sale, Kollat had not sold a single share of the Company's stock since August 2011, when he sold a mere 5,000 shares. Moreover, in the last 4 years, Kollat had never sold any stock during the Company's first quarter, with his only other during the preceding four year period occurring in August 2009, when he sold just 3,737 shares.

38.     On March 6, 2012, Solt sold 6,425 shares of Big Lots common stock for a weighted average sale price of $43.57 per share.  Solt garnered proceeds of $279,937.25 from his March 6, 2012 sale.  Prior to this sale, Solt had not sold a single share of the Company's stock since June 2010.

39.     On March 6, 2012, Rankin sold 21,300 shares of Big Lots common stock for a weighted average sale price of $44.37 per share outside of both the Company's 401(k) plan and Rankin's 10b5-1 plan.  Prior to this sale, Rankin had only sold Big Lots common stock pursuant to the Company's 401(k) Plan or a 10b5-1 plan and had not sold a single share of the Company's common stock since 2010.  Rankin garnered proceeds of nearly $1 million from his March 6, 2012 sale.

40.     On March 6, 2012, Lauderback sold 30,000 shares of the Company's common stock for a weighted average sale price of $44.04 per share.  Lauderback effected these sales by exercising three different grants of 10,000 stock options each, some of which did not expire until 2017.  Lauderback garnered proceeds of approximately $1.32 million from the sale of her Big Lots common stock.  Prior to this sale, Lauderback had not sold a single share of the Company's stock since June 2011, when she sold a mere 1,090 shares.

41.     On March 7, 2012, Segal sold 11,250 shares of the Company's common stock for $44.85 per share for a total of $504,562.50.  Two days later on March 9, 2012, Segal sold 5,792

shares of the Company's common stock for a weighted average sale price of $45.41 per share for a total of $263,014.72. Segal made his third sale of Big Lots' common stock less than one week later on March 13, 2012, when he sold 5,458 shares of the Company's common stock for $45.65 per share for a total of $249,157.70. On March 21, 2012, Segal sold 1,875 shares of the Company's common stock for $45.70 per share for a total of $85,687.50. On March 27, 2012, Segal sold 4,264 shares of the Company's common stock for $46.40 per share for a total of $197,849.60. One day later, Segal made his **sixth** sale in a three-week period, selling 7,736 shares of the Company's common stock for a weighted average sale price of $45.86 per share for a total of $354,772.96. Segal reaped over $1.65 million in proceeds for his own personal gain from these six sales in a three-week period. Prior to these sales, Segal had not sold a single share of the Company's stock since April 2010, which sales were pursuant to a 10b5-1 plan.

42.     On March 7, 2012, Schroeder sold 4,000 shares of the Company's common stock for a weighted average sale price of $44.55 for a total of $178,200. Schroeder sold an additional 5,000 shares of Big Lots' common stock on March 22, 2012 for $45.11 per share, garnering proceeds of $225,550. Five days later, on March 27, 2012, Schroeder sold 2,000 shares of the Company's common stock for a weighted average sale price of $46.60 per share for a total of $93,200. In total, Schroeder garnered proceeds of nearly half a million dollars from these insider trades in March 2012. Prior to these three sales, Schroeder had not sold a single share of the Company's stock since April 2010, when he sold 3,600 shares pursuant to a 10b5-1 plan.

43.     On March 7, 2012, Cooper sold 44,875 shares of the Company's common stock for a weighted average sale price of $44.76 per share for a total of approximately $2 million. Less than three weeks later, on March 27, 2012, Cooper sold an additional 25,000 shares of the Company's common stock for a weighted average sale price of $46.60 per share for a total of

approximately $1.165 million. Cooper reaped over $3 million in proceeds for his own personal gain from these March 2012 sales. Prior to these sales, Cooper had not sold a single share of the Company's stock since April 2010, when he sold shares pursuant to a 10b5-1 plan.

44.     On March 7, 2012, Tishkoff sold 4,000 shares of the Company's common stock for a weighted average sale price of $44.62 per share, garnering proceeds of $178,480. Prior to this sale, Tishkoff had not sold a single share of the Company's common stock since March 2010.

45.     On March 8, 2012, Martin sold 73,750 shares of the Company's common stock for a weighted average sale price of $45.00 per share, garnering proceeds of $3,318,750. Martin effected these sales by exercising 5 separate grants of stock options, none of which expired prior to 2014 and some of which did not expire until 2018. Nine days later, on March 27, 2012, Martin sold an additional 15,000 shares of the Company's common stock for a weighted average sale price of $46.60 per share for a total of $699,000. Martin sold a total of 88,750 shares of Big Lots common stock and garnered proceeds of over $4 million from these insider trades in March 2012. Prior to these sales, Martin had not sold a single share of the Company's stock since April 2010, when he sold shares pursuant to a 10b5-1 plan.

46.     On March 9, 2012, Mallott sold 1,500 shares of the Company's common stock for a weighted average sale price of $45.39 per share, garnering proceeds of $68,085.00. Prior to this sale, Mallott had not sold a single share of the Company's stock since March 2010.

47.     On March 12, 2012, Berger sold 20,000 shares of the Company's common stock for a weighted average sale price of $45.21 per share for a total of $90,420. This was the first sale of Big Lots common stock that Berger had ever made since becoming a Big Lots' director in 2006.

48.     On March 13, 2012, Claxton sold 37,500 shares of the Company's common stock for a weighted average sale price of $45.71 per share for a total of approximately $1.71 million. Two weeks later, on March 27, 2012, Claxton sold 15,000 shares of the Company's common stock for a weighted average sale price of $46.60 per share, garnering proceeds of $699,000. Claxton received over $2.4 million in proceeds from these insider sales in March 2012.  Claxton had not sold a single share of the Company's common stock since December 2011, when he sold a paltry 1,429 shares, and prior to that all of Claxton's stock sales were pursuant to a 10b5-1 plan.

49.     On March 14, 2012, Johnson sold 5,625 shares of the Company's common stock for $45.47 per share, garnering proceeds of $255,768.75.  Less than two weeks later, on March 27, 2012, Johnson sold 649 shares of the Company's common stock for $46.40 per share for a total of $30,113.60.  Johnson received $285.882.35 in proceeds from these insider sales in March 2012.  Prior to these two sales, Johnson had not sold a single share of the Company's common stock since April 2010, when he sold shares pursuant to a 10b5-1 plan.

50.     On March 15, 2012, Haubiel sold 56,250 shares of the Company's common stock for a weighted average sale price of $45.61 per share.  Haubiel effected these sales by exercising three separate grants of stock options, none of which expired prior to 2014 and some of which did not expire until 2016.  Haubiel garnered proceeds of over $2.56 million from this large insider sale, which was not pursuant to Haubiel's 10b5-1 plan.  Prior to this sale and since April 2010, Haubiel had only sold shares of Big Lots common stock pursuant to a 10b5-1 plan.

51.     On March 19, 2012, Smart sold 10,000 shares of the Company's common stock for $45.75 per share for a total of $457,500.  Less than ten days later on March 27, 2012, Smart sold an additional 10,000 shares of the Company's common stock for a weighted average sale

price of $46.60 per share totaling $466,000.  Smart received $923,500 in proceeds from these insider sales in March 2012.  Prior to these sales, Smart had only sold shares of the Company's common stock once in March 2010 pursuant to a 10b5-1 plan.

52.　　On March 20, 2012, Fishman sold 227,500 shares of the Company's common stock for a weighted average sale price of $45.23 per share, garnering proceeds of over $10 million.  One week later, Fishman sold an additional 106,125 shares of the Company's common stock for $46.40 per share for a total of more than $4.9 million.  Thus, in one week, Fishman sold a total of 333,625 shares of Big Lots common stock, garnering proceeds of over $15 million from these insider trades.  Prior to these sales, Fishman had not sold a single share of the Company's stock since 2010, when he made numerous sales that were all governed by a 10b5-1 plan.

53.　　In total, 16 officers and directors of the Company sold a total of 817,874 shares of Big Lots common stock in 29 different transactions over a 23-day period from March 6, 2012 to March 28, 2012 based on their knowledge of material, non-public information concerning the slowdown in the Company's U.S. comparable store sales, thereby reaping in excess of $37 million in illegal insider trading proceeds for their personal gain. The following chart depicts the Individual Defendants' stock sales:

| Date | Insider Seller | Number of Shares | Price | Total Price |
|---|---|---|---|---|
| March 6, 2012 | David T. Kollat | 60,000 | $43.96 | $2,637,600.00 |
| March 6, 2012 | Russell Solt | 6,425 | $43.57 | $279,937.25 |
| March 6, 2012 | Norman J. Rankin | 21,300 | $44.37 | $945,081.00 |
| March 6, 2012 | Brenda J. Lauderback | 30,000 | $44.04 | $1,321,200.00 |
| March 7, 2012 | Robert Samuel Segal | 11,250 | $44.85 | $504,562.50 |

| | | | | |
|---|---|---|---|---|
| March 7, 2012 | Paul Alan Schroeder | 4,000 | $44.55 | $178,200.00 |
| March 7, 2012 | Joe R. Cooper | 44,875 | $44.76 | $2,008,605.00 |
| March 7, 2012 | Dennis B. Tishkoff | 4,000 | $44.62 | $178,480.00 |
| March 8, 2012 | John Charles Martin | 73,750 | $45.00 | $3,318,750.00 |
| March 9, 2012 | Philip E Mallott | 1,500 | $45.39 | $68,085.00 |
| March 9, 2012 | Robert Samuel Segal | 5,792 | $45.41 | $263,014.72 |
| March 12, 2012 | Jeffrey Paul Berger | 20,000 | $45.21 | $904,200.00 |
| March 13, 2012 | Robert Craig Claxton | 37,500 | $45.71 | $1,714,125.00 |
| March 13, 2012 | Robert Samuel Segal | 5,458 | $45.65 | $249,157.70 |
| March 14, 2012 | Timothy A. Johnson | 5,625 | $45.47 | $255,768.75 |
| March 15, 2012 | Charles W. Haubiel II | 56,250 | $45.61 | $2,565,562.25 |
| March 19, 2012 | Steven Ray Smart | 10,000 | $45.75 | $457,500.00 |
| March 20, 2012 | Steven S. Fishman | 227,500 | $45.23 | $10,289,825.00 |
| March 21, 2012 | Robert Samuel Segal | 1,875 | $45.70 | $85,687.50 |
| March 22, 2012 | Paul Alan Schroeder | 5,000 | $45.11 | $225,550.00 |
| March 27, 2012 | Joe R. Cooper | 25,000 | $46.60 | $1,165,000.00 |
| March 27, 2012 | Steven S. Fishman | 106,125 | $46.40 | $4,924,200.00 |
| March 27, 2012 | Timothy A. Johnson | 649 | $46.40 | $30,113.60 |
| March 27, 2012 | Paul Alan Schroeder | 2,000 | $46.60 | $93,200.00 |
| March 27, 2012 | John Charles Martin | 15,000 | $46.60 | $699,000.00 |
| March 27, 2012 | Steven Ray Smart | 10,000 | $46.60 | $466,000.00 |
| March 27, 2012 | Robert Craig Claxton | 15,000 | $46.60 | $699,000.00 |
| March 27, 2012 | Robert Samuel Segal | 4,264 | $46.40 | $197,849.60 |
| March 28, 2012 | Robert Samuel Segal | 7,736 | $45.86 | $354,772.96 |
| **Sum of Total Proceeds** | | | | **$37,080,028.08** |

54.     According to the Forms 4 filed by the Individual Defendants, only the sales made on March 27 and 28, 2012 were purportedly "made pursuant to a plan intended to comply with Rule 10b5-1."  However, considering that (i) the Forms 4 do not unequivocally state that the subject transactions complied with Rule 10b5-1; (ii) the terms of these purported plans were not disclosed; (iii) it was not disclosed when these purported plans were entered into; and (iv) in the preceding days and weeks many of the Individual Defendants made stock sales that were not pursuant to a 10b5-1 plan, these transactions, like all of the Individual Defendants' March 2012 stock sales, appear to be improper insider sales.

55.     At the time of each of the foregoing stock sales, each of the Individual Defendants knew, but failed to disclose to shareholders or the market, that (i) Big Lots' previously announced first quarter guidance was overstated; (ii) contrary to the guidance issued on March 2, 2012, Big Lots was experiencing a decrease, not an increase, in comparable store sales; and (iii) revelation to the market of the truth regarding the Company's financial condition and prospects would likely cause Big Lots' stock price to fall substantially.

56.     Each of the Individual Defendants knew the foregoing material non-public information as a result of their access to and receipt of the Company's sales reports and other internal documents and meetings and conversations with fellow directors, officers and employees.  Each of the Individual Defendants made their foregoing stock sales on the basis of and because of their knowledge of this material non-public information.

57.     The stock sales described herein were not part of any normal or regular pattern or practice of such sales by the Individual Defendants, but rather were unusual in timing and amount in that all of the Individual Defendants sold large percentages of their total holdings of Big Lots stock over an approximately three week period commencing just after the Company's

March 2, 2012 announcement of positive guidance for the first quarter of 2012 and ending just before the Company's April 23, 2012 announcement rescinding that positive guidance and issuing negative guidance. Specifically, between March 6, 2012 and March 28, 2012, the Individual Defendants sold the following percentages of their total holdings of Big Lots common stock:

a.  Defendant Kollat sold approximately 70 percent of his Big Lots stockholdings;

b.  Defendant Solt sold approximately 42 percent of his Big Lots stockholdings;

c.  Defendant Rankin sold approximately 49 percent of his Big Lots stockholdings;

d.  Defendant Lauderback sold approximately 74 percent of her Big Lots stockholdings;

e.  Defendant Segal sold approximately 65 percent of his Big Lots stockholdings;

f.  Defendant Schroeder sold approximately 73 percent of his Big Lots stockholdings;

g.  Defendant Cooper sold approximately 54 percent of his Big Lots stockholdings;

h.  Defendant Tishkoff sold approximately 22 percent of his Big Lots stockholdings;

i.  Defendant Martin sold approximately 62 percent of his Big Lots stockholdings;

j.  Defendant Mallot sold approximately 11 percent of his Big Lots stockholdings;

k.  Defendant Berger sold approximately 60 percent of his Big Lots stockholdings;

l.  Defendant Claxton sold approximately 58 percent of his Big Lots stockholdings;

m.  Defendant Johnson sold approximately 17 percent of his Big Lots stockholdings;

n.  Defendant Haubiel sold approximately 41 percent of his Big Lots stockholdings;

o.  Defendant Smart sold approximately 50 percent of his Big Lots stockholdings;

p.  Defendant Fishman sold approximately 46 percent of his Big Lots stockholdings.

**Big Lots Discloses that Its Previously Announced First Quarter Guidance Was Overstated**

58.     On April 23, 2012, after the market closed, Big Lots issued a press release entitled "Big Lots Updates First Quarter Sales Guidance."  Therein, the Company disclosed the following, in relevant part:

> Based on retail sales results quarter-to-date and assumptions for the balance of the first quarter of fiscal 2012, we now expect U.S. comparable store sales to be slightly negative compared to our prior guidance issued on March 2, 2012, which estimated a comparable store sales increase of 2% to 4%.  U.S comparable store sales were on plan through the first six weeks of the quarter; however, sales compared to plan began to slow in late March and trends have further softened as we moved through the month of April.

59.     As the Individual Defendants expected, on this news the price of the Company's shares collapsed from a closing price of $45.71 per share on April 23, 2012 to a closing price of $34.71 per share on April 24, 2012, representing a decline of approximately 24% in one day. More than 13.2 million shares of the Company's common stock were traded on April 24, 2012, representing more than 8 times the Company's average daily trading volume.

60.     The suspicious timing and nature of the Individual Defendants' stock sales starting on March 6, 2012 raises a strong inference that notwithstanding the statement in the Company's April 23, 2012 press release that "sales compared to plan began to slow in late March," the Individual Defendants were aware of the slowdown in the Company's U.S. comparable store sales at the time of all their March 2012 stock sales.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

61.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of law.

62.     Plaintiff is a shareholder of nominal defendant Big Lots, was a shareholder of Big Lots at the time of the wrongdoing alleged herein, and has been a shareholder of Big Lots continuously since that time.

63.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

64.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Big Lots' Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

65.     The Board currently consists of nine directors: defendants Berger, Fishman, Kollat, Lauderback, Mallott, Solt, Tishkoff, and directors Hayes and Tener.  A demand to institute and vigorously prosecute this action would be a futile and useless act because seven of the nine directors, defendants Berger, Fishman, Kollat, Lauderback, Mallott, Solt, Tishkoff, engaged in improper self-dealing by selling their shares of Big Lots common stock on the basis of and because of their knowledge of material non-public information regarding the Company's financial condition and prospects, as alleged in detail herein.  Accordingly, a majority of the Board is incapable of independently and disinterestedly considering a demand to institute and vigorously prosecute this action.

## COUNT I

**Against the Individual Defendants
for Breach of Fiduciary Duty in Connection with Insider Stock Sales**

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.     At the time of the stock sales set forth herein in March 2012, each of the Individual Defendants knew, but did not disclose publicly, the material information described herein, and each of the Individual Defendants made the stock sales described herein on the basis of and because of their knowledge of this material non-public information.

68.     The Individual Defendants' sales of Big Lots common stock based on their knowledge of the foregoing material non-public information was a breach of their fiduciary duties of loyalty and good faith.

69.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds the Individual Defendants obtained thereby.

## COUNT II

**Against the Individual Defendants**
**for Breach of Fiduciary Duty for Violating the Big Lots' Code of Ethics**

70.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.     Section 3 of the Company's Code of Ethics states, in pertinent part:

Associates, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business.  All non-public information about the Company should be considered confidential information.  To use non-public information for personal financial benefit or to "tip" other who might make an investment decision on the basis of this information is not only unethical but also illegal

72.     By engaging in insider trading in direct violation of the Company's Code of Ethics, the Individual Defendants' breached their fiduciary duties of loyalty and good faith by failing to abide by the Company's standards for officer and director conduct.

73.     To remedy the Individual Defendants' breaches of fiduciary duties, the Court should impose a constructive trust on any proceeds the Individual Defendants obtained in violation of the Company's Code of Ethics.

## COUNT III

**Against the Individual Defendants**
**for Violation of the Uniform Trade Secrets Act, ORC §§ 1333.61 *et seq*.**

74.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

75.     The material non-public information described herein is a "trade secret" pursuant to ORC § 1333.61(D), which defines a "trade secret" as, among other things:

> any business information or plans, [or] financial information . . . that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Specifically,

a.      the material non-public information described herein is "business information" and/or "financial information";

b.      as demonstrated by the immediate and dramatic effect its disclosure had on the price of Big Lots common stock, the information derives actual or potential independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, *e.g*., by using it to sell shares of Big Lots common stock prior to disclosure of the information, as the Individual Defendants did; and

      c.    the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, *e.g.*, efforts by the Company, including explicit Company policies and procedures, to maintain the confidentiality of the Company's confidential business and financial information.

76.    The Individual Defendants' use of the material non-public information described herein to sell their shares of Big Lots common stock prior to disclosure of the information was a "misappropriation" pursuant to ORC § 1333.61(B), which defines "misappropriation" as, among other things:

> Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who . . . [a]t the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired . . . was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use. . . .

Specifically, at the time of each of the Individual Defendants' use of the material non-public information, which they used without the express or implied consent of the Company, each of the Individual Defendants knew or had reason to know that their knowledge of the material non-public information was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, *i.e.*, in their capacities as officers and/or directors of Big Lots, which, pursuant to the Section 3 of the Company's Code of Ethics, required them to maintain the confidentiality of the information and refrain from using it to sell their shares of Big Lots common stock.

77.    As a direct and proximate result of the Individual Defendants' misappropriation of the Company's material non-public information, the Company is entitled to damages pursuant to ORC § 1333.63(A), which provides that:

> a complainant in a civil action is entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by

imposition of liability for a reasonable royalty that is equitable under the circumstances considering the loss to the complainant, the benefit to the misappropriator, or both, for a misappropriator's unauthorized disclosure or use of a trade secret.

78. The Individual Defendants' misappropriation of the Company's material non-public information was willful and malicious, and therefore the Company is also entitled to punitive or exemplary damages pursuant to ORC § 1333.63(B), which provides that "[i]f willful and malicious misappropriation exists, the court may award punitive or exemplary damages in an amount not exceeding three times any award made under division (A) of this section."

## COUNT IV

### Against the Individual Defendants
### for Unjust Enrichment

79. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

80. Because the Individual Defendants were unjustly enriched by their receipt of proceeds from their illegal sales of Big Lots common stock, as alleged herein, it would be unconscionable to allow them to retain the benefits of their illegal conduct.

81. Specifically, the Individual Defendants had a benefit conferred upon them by the Company through their gains from illegal sales of Big Lots common stock while in possession of the Company's material, non-public business and financial information, and the Individual Defendants have retained this benefit unjustly without making any payment to the Company for their ill-gotten gains.

82. To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Big Lots stock.

WHEREFORE, Plaintiff demands judgment as follows:

    A. Against all of the Individual Defendants and in favor of the

Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the Uniform Trade Secrets Act;

B.     Ordering all Defendants to disgorge to the Company all of the proceeds they received by selling Big Lots stock between March 2, 2012 and March 28, 2012;

C.     Awarding punitive or exemplary damages pursuant to ORC § 1333.63(b) for the Individual Defendants' violation of the Uniform Trade Secrets Act;

D.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  May 22, 2012             Respectfully submitted,

**ISAAC BRANT LEDMAN & TEETOR, LLP**

_____
Mark Landes (0027227)
Maribeth Deavers (0055903)
250 E. Broad Street
Suite 900
Columbus, OH 43215
Telephone: (614) 221-2121
Facsimile: (614) 365-9516
maribethdeavers@isaacbrant.com
marklander@ isaacbrant.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Eric L. Zagar
Robin Winchester
J. Daniel Albert
Stefanie L. Anderson
280 King of Prussia Road
Radnor, PA 19087
Phone: (610) 667-7706

Facsimile: (610) 667-7056
ezagar@ktmc.com
rwinchester@ktmc.com
dalbert@ktmc.com
sanderson@ktmc.com

*Attorneys for Plaintiff*